# 𝔚𝔶𝔱𝔥𝔢𝔟𝔦𝔩𝔩𝔢

## John Hall v. Commonwealth of Virginia.

June 8, 1942.

Record No. 2537.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*M. M. Long* and *Burns & Lively*, for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Walter E. Rogers, Special Assistant,* for the Commonwealth.

Holt, J., delivered the opinion of the court.

On June 24, 1941, a jury of Dickenson county returned into court this verdict, which was confirmed by the trial court in case No. 835:

"We the jury find the defendant not guilty as charged in the within indictment as to Nolen Mullins. John H. Strouth, Foreman."

And in case No. 830 Maiming:

"We the jury find the defendant guilty of unlawful wounding as charged in the within indictment and fix his punishment at 2 years in the penitentiary. John H. Strouth, Foreman."

It is the defendant, John Hall, who was found guilty, and it is he who has obtained this writ of error.

Estil Willis is a deputy sheriff for Dickenson county and town sergeant in the town of Haysi. When shot, Willis was in uniform.

On the afternoon of December 24, 1940, Willis went into the post office. In it were Mr. Dalton, a school teacher, and his wife. Dalton said to him: "Mr. Willis, John Hall is down in the drug store drunk and got two guns out on the table down there."

Forty or fifty minutes later, while Willis was sitting in Rake's restaurant, he saw Hall pass up the street. Hall was then holding Willie Branham by the arm and appeared to be staggering. Willis then went out of the restaurant and in doing so passed Nolen Mullins, another deputy sheriff, and signaled for him to follow. Willis followed Hall and was himself followed by Nolen Mullins. As he caught up with Hall he reached out, touched him or caught him by the arm, and said:

" 'John, consider yourself under arrest.' He wheeled around and said: 'What does this mean?' Or something like that. I don't know if he had his gun in his left hand or got it out or what, but he shot me under like that (indicating).

"Q. 22. He put his left hand under his right arm and shot you? A. Yes, sir, and right here is the bullet hole where he first hit me (indicating)."

The bullet entered the abdomen, pierced the liver, pierced the right kidney and came out behind the kidney; another bullet struck him in the foot. Hall was then shot. The

bullet went through his left lung. He had bullet holes in each thigh and in the scrotum.

Both of these men were desperately wounded; both were taken to hospitals, and both appear to have gotten well.

For the Commonwealth there is other evidence to the effect that Hall was intoxicated.

The evidence on behalf of Hall is that he was not intoxicated but was walking peaceably up the street when Willis, without warning, grabbed him roughly around the body and that he, Hall, was at that time shot through the shoulder by some one, the inference of course being that it was either by Willis or by Mullins. In short, Hall's contention is that he was shot first and that any shooting which he afterwards did was in self-defense.

As we have seen, it is the Commonwealth's contention that Hall fired the first shot and fired it without just cause; indeed, without any cause at all.

This conflict of evidence has been settled by a jury's verdict. Certainly after the first shot others were fired both by Hall, Willis and Mullins. These shots and their order we can never know. All that took place took place almost in a moment of time. If we accept as true evidence which sustains the verdict, it is sufficient for that purpose. Indeed, we do not understand that the sufficiency of the Commonwealth's evidence, if accepted, is seriously challenged.

The court refused to give instruction No. 3, tendered on behalf of the defendant. That instruction reads:

"The court instructs the jury that defendant was at the time of the difficulty a Notary Public, a peace officer, and that he had the right to carry on his person a pistol or pistols, and had the right to carry same either concealed or unconcealed."

It did give it in the form of instruction No. 3a, which reads:

"The court instructs the jury that defendant was at the time of the difficulty a Notary Public, a peace officer, and that he had the right when in the discharge of his official duty, to carry on his person a pistol or pistols, and had the right to carry same either concealed or unconcealed."

We think it is plain that it was never intended that all the Notaries Public in the State could go about at all times armed. And even if such power be vested in them certainly this Notary, who, if we accept the jury's verdict, was drunk upon a public street, had no authority to shoot down a deputy sheriff because he had been told to consider himself under arrest.

Next it is said that the court erred in allowing Dalton to tell Willis forty or fifty minutes before the arrest that the defendant was down at a drug store drunk with two pistols out. When this evidence was received the court told the jury that it was not competent to show that Hall was drunk but was received for the purpose of showing why the officer acted as he did.

Admitted for this purpose, it was quite like what occurred in *McReynolds* v. *Commonwealth*, 177 Va. 933, 15 S. E. (2d) 70.

It is competent to show why Willis undertook the arrest and tends to corroborate his testimony.

The Commonwealth's instruction No. 3 is objected to. This is that instruction:

"The court instructs the jury that if the defendant was drunk on the street in the town of Haysi, where more than one other person was in view, then Estil Willis as deputy sheriff or town sergeant, had the right to, and it was his duty, to arrest the defendant, either by virtue of, or without a warrant; and this is so even if the defendant was a Notary Public, and was not at the time creating a disturbance or molesting anyone, but peacefully walking along the sidewalk."

Willis has testified that this defendant was drunk on the streets of Haysi, and the evidence is that his intoxication was manifest to any observer. The officer had a right to arrest him without a warrant. Not only could he arrest a Notary Public in such circumstances but he might arrest any other officer however exalted might be his station.

Petitioner next objected to instruction No. 4, which reads:

"The court tells the jury that if they believe, beyond a reasonable doubt, that at the time of this difficulty the de-

fendant was drunk, and that Willis, the deputy sheriff, undertook to arrest him, and, in so doing, was using no violence other than to take hold of him with his hands, and that the defendant thereupon shot and wounded Willis, to prevent being arrested, then he is guilty of a malicious wounding, punishable by from one to ten years in the penitentiary."

Plainly one who is drunk upon a public street can not shoot down an officer in uniform, as Willis was, or out of uniform, who does no more than place his hand upon him and tell him that he is under arrest. Indeed, to shoot down a private citizen under circumstances named might be murder.

The defendant's theory of the case was amply presented in another instruction, No. 5a. There the court told the jury that if the defendant was walking along the street in a peaceful way and if Willis grabbed him around the body and if in attempting to free himself from this officer's grip the officer or someone for him shot him through the shoulder, then they should find him not guilty.

The substance of it all is that the jury was told that the defendant was guilty if they accepted as true the Commonwealth's account of the difficulty, and they were told that he was not guilty if they accepted as true the defendant's account of it.

The Commonwealth's account was accepted; the jury's verdict has been approved by the trial court, and under rules long established we, too, must accept it unless it be plainly wrong, or unless, during the progress of the trial, some harmful error was committed.

Finally, we are asked to order a new trial because of after-discovered evidence. Many cases deal with this subject.

In *Harris* v. *Wall*, 144 Va. 774, 130 S. E. 899, it is said:

"Motions to set aside the verdicts of juries and judgments entered thereon, based upon after-discovered evidence, are not as a rule looked upon with favor by the courts.

"The policy of the law is to give to every litigant one, and only one, opportunity of presenting his case to the jury or before the court, and when this has been had, the results

of the trial will not usually be disturbed unless the party moving can place himself within the rules as frequently announced by the Supreme Court. They are substantially as follows:

"1. The evidence must have been discovered since the trial.

"2. It must be such as could not, by the exercise of diligence, have been discovered before the trial terminated.

"3. It must be material, and such as ought to produce a different result on the next trial.

"4. It must not be merely cumulative, corroborative or collateral. Burks' Pl. & Prac. (2d ed.) 556; *Barsa* v. *Kator*, 121 Va. 290, 93 S. E. 613; and *Carson* v. *Mott*, 117 Va. 21, 84 S. E. 12."

In *Pauley* v. *Commonwealth*, 151 Va. 510, 144 S. E. 361, it is said that "every man is entitled to one fair trial, and no man is entitled to more. It is for these reasons that motions for new trials, because of after-discovered evidence, are not looked upon with favor. If this were not true, then justice, sometimes none too swift, would be more leaden-footed than ever."

The law on this subject has been tersely stated by Chief Justice Campbell in *Holbrook* v. *Commonwealth*, 165 Va. 700, 181 S. E. 353:

"The rule governing the granting of new trials for after-discovered evidence has been repeatedly stated by this court as follows:

" '1st. The evidence must have been discovered since the trial. 2nd. It must have been evidence that could not have been discovered before the trial by the exercise of reasonable diligence. 3rd. It must be material in its object, and such as ought, on another trial, to produce an opposite result on the merits. 4th. It must not be merely cumulative, corroborative, or collateral.' See *Johnson's Case*, 104 Va. 881, 886, 52 S. E. 625, 626; *St. John's Ex'rs* v. *Alderson*, 32 Gratt. (73 Va.) 140; *Harris* v. *Wall*, 144 Va. 774, 130 S. E. 899; *Pauley* v. *Commonwealth*, 151 Va. 510, 144 S. E. 361."

Of course there must be fair reason to believe that

the presence of a witness relied upon can be had at a new trial if ordered.

In the turn which this case took at its trial, the accused was guilty if he fired the first shot; he was innocent if he did not begin the shooting but shot only after he had been wounded and in self-defense. All of this the court in apt instructions told the jury.

There were four of these affidavits—one by the accused and one by his brother, Levi. They deal with due diligence and we may accept that as proven.

Kelsey Stanley, a student at Berea College, was home on his Christmas vacation. He does not know how trouble began and so his evidence is not particularly valuable.

Charlie Hall is a distant cousin of the accused. He is twenty-eight years old, is a sergeant in the United States Army and is stationed at Fort Bragg, North Carolina. He was at Haysi on furlough at the time of the shooting and was there at the time of the trial. Soon after the trial he returned to Dickenson county and was told that John Hall had been tried and convicted. He said that he was on a sidewalk in Haysi when his attention was attracted by the first shot. He looked up and saw the fire from Mullins' pistol. He said that two shots were fired and that these were the first shots fired and that at that time Estil Willis had "John Hall from behind and Hall's arm was pinned down by his side." He said that Willis then fired one shot and that Hall started backing across the street, drew a gun from his right-hand pocket and began to fire. He said that Mullins began to fire again and Hall staggered across the street and that Hall had fallen in the street before the last two shots were fired; that he did not tell any one that he had seen the shooting since he did not wish to be a witness. He did tell Hall what he had seen but this was after the trial when he thought the case was over and that there was no possibility of his being summoned from Fort Bragg.

Charlie Hall's affidavit in all of its essentials sustains the testimony of his distant cousin and flatly contradicts that of Estil Willis and Nolen Mullins, deputy sheriffs who participated in the attempt to arrest.

■ We have here a type and model of cumulative evidence. Moreover, if there were a new trial there is no good reason to believe that a jury would disagree with the one which has already heard the case. Again, Charlie Hall when last heard from was at Fort Bragg, North Carolina. He may still be there; we do not know. If this case were tried again, he might be in California or he might be overseas. Certain it is that he will not continue indefinitely at Fort Bragg. Over his movements the courts of Virginia have no control.

There is no error in the record. It is affirmed.

*Affirmed.*